**ARKOMA COAL CORPORATION,**
Plaintiff,

v.

C.V. ALEXANDER, M.D.; Herman Butler; Jerald M. Duncan, M.D.; Elliot Himmelfarb, M.D.; Mike Isom; Ralph King, M.D.; Martha McDonald, M.D.; Harry L. Page, M.D.; Sterling A. Roaf, M.D.; Michael Spalding, M.D.; Banks Blackwell, M.D.; Ernest R. Coleman; Barry E. Gerald, M.D.; Jerry Humphreys, M.D.; Gary M. Jeter; John R. Mendenhall; Jerry C. Phillips, M.D.; H. Clay Robinson; Hoy Speer, M.D.; Marilyn Speer, M.D.; James H. Brown; Talluri Sita Devi, M.D.; Robert Gold, M.D.; Shafquat Hussain, M.D.; Mahmood Ali Khan, M.D.; Jack G. Rabinowitz, M.D.; Steve Sherman, M.D.; Owen B. Tabor, M.D.; David Tepper, M.D.; E.R.N. Coal Company and the Estate of Rustam A. Malik, M.D., Defendants.

Civ. No. 83–2186.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Sept. 20, 1984.

J. Michael Shaw and James A. Arnold, II, Shaw, Ledbetter, Hornberger, Cogbill & Arnold, Fort Smith, Ark., for plaintiff.

James H. Kee, Johnson, Grusin, Kee & May, P.C., Memphis, Tenn., H. Clay Robin-

son, Pryor, Robinson & Barry, Fort Smith, Ark., for defendants, C.V. Alexander, M.D.; Herman Butler; Jerald M. Duncan, M.D.; Elliott Himmelfarb, M.D.; Mike Isom; Ralph King, M.D.; Martha McDonald, M.D.; Harry L. Page, M.D.; Sterling A. Roaf, M.D.; Michael Spalding, M.D.; Banks Blackwell, M.D.; Ernest R. Coleman; Barry E. Gerald, M.D.; Jerry Humphreys, M.D.; Gary M. Jeter; John R. Mendenhall; Jerry C. Phillips, M.D.; H. Clay Robinson; Hoy Speer, M.D.; Marilyn Speer, M.D.; James H. Brown; Robert Gold, M.D.; Jack G. Rabinowitz, M.D.; Steve Sherman, M.D.; Owen B. Tabor, M.D.; David Tepper, M.D.; and E.R.N. Coal Co.

Jack A. McNulty, Bridges, Young, Matthews, Holmes & Drake, Pine Bluff, Ark., for defendants, Talluri Sita Devi; Shafquat Hussain; Mahmood Ali Khan; and the Estate of Rustam Ali Malik, Deceased.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is another of the lawsuits arising out of the business activities of David R. Kane and his controlled company, Summa T Corporation. A copy of the chart of Kane's organization is attached as Exhibit "A" to this opinion, and a copy of the chart of the venture which is the subject matter of this lawsuit is attached as Exhibit "B". These are pages 24 and 23, respectively, of Plaintiff's Exhibit 3 introduced at the trial.

Plaintiff, Arkoma Coal Corporation, an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma, filed suit against the multiple defendants, claiming that on December 30, 1977, it entered into a contract with Coking Coal, Inc., (Coking) providing for the sale by Coking to Arkoma of substantially all of its requirements for coal for a period of five years beginning on the date of the agreement. The agreement was attached as Exhibit "B" to the complaint and was introduced at the trial as Plaintiff's Exhibit 2.

It is alleged in the complaint that this contract was entered into by Coking in behalf of and for the benefit of a joint venture known as Philpott Associates and made up of the defendants who had invested in the joint venture and had joined together for the purpose of mining coal from a particular seam of coal in Johnson County, Arkansas, known as the "Philpott Seam."

It is claimed that during the contract negotiations between plaintiff and Coking, Coking's officers advised the plaintiff that it was financially backed by a group of investors known as Philpott Associates which would have substantial financial worth and which would cause the investors making up this group to be jointly and severally liable for any claims against Coking Coal, Inc., arising out of the contract which had been entered into. Plaintiff claims that this representation and the potential existence of the investor group with substantial net worth was relied upon by the plaintiff and was a major factor in inducing plaintiff to enter into the agreement with Coking.

The complaint alleges that in late 1978 Coking filed an action in the Chancery Court of Johnson County, Arkansas (No. E–78–181), and that a trial was held in the case on June 28, 1982. It is claimed that Coking was represented by counsel and its vice president, Jim Elliott, and that after hearing testimony and reviewing the exhibits, the court awarded Arkoma Coal Corporation judgment against St. Paul Fire and Marine Insurance Company (which had written a performance bond) and Coking Coal, Inc., jointly and severally, in the amount of $53,656.71, and against Coking Coal, Inc., alone in the further amount of $221,235.22. The judgment was attached as Exhibit "C" to the complaint and was introduced at the trial as Plaintiff's Exhibit 4.

The joint and several judgment against Coking and St. Paul Fire and Marine Insurance Company was paid by St. Paul and that portion of the judgment released. It is alleged that the judgment against Coking Coal, Inc., remains outstanding and unpaid despite the issuance of a writ of execution which was returned wholly unsatisfied. Plaintiff alleges that under the terms of a

Joint Operating Agreement executed by each of the defendants, each defendant is personally liable, on a joint and several basis, for all of the Philpott Associates venture liabilities, and that judgment should be entered against the defendants, jointly and severally, in the amount of $241,555.12 (which includes interest to May 28, 1983), and interest at the rate of ten percent (10%) thereafter.

During the pretrial stage of this matter, a number of motions were filed and disposed of by the court, including motions to dismiss filed in behalf of each of the defendants raising certain contentions. The motions to dismiss were denied for the reasons set forth in the court's letter to the attorneys dated December 7, 1983. In short, the court found that it could not say that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Robinson v. MFA Mutual Ins. Co.*, 629 F.2d 497 (8th Cir.1980).

This matter was tried to the court without a jury on May 24 and 25, 1984. At the request of the attorneys for the parties, the court allowed time for a transcript to be prepared and delivered by the court reporter and for the attorneys to file briefs in the case. The briefs have been received and considered, and the matter is now ripe for decision.

### FINDINGS OF FACT

1. Plaintiff is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma, and is owned and controlled by Ben G. Henneke, Jr.

2. The defendants are primarily if not totally business and professional persons, all of whom reside in either Arkansas, Tennessee, Illinois, New Jersey and Pennsylvania, and none of whom are citizens or residents of the State of Oklahoma.

3. The president and controlling shareholder of Arkoma Coal Corporation (Arkoma) is Ben G. Henneke, Jr., a person with substantial education and business experience. Mr. Henneke graduated from Yale University in 1968 and received a Masters of Business Administration from Harvard Business School in 1973. After receiving his Masters, he went with the Williams Companies of Tulsa, Oklahoma, engaged in the energy industry as a senior financial analyst in the merger and acquisitions division reporting to a senior vice president. In such position he was engaged in "looking to acquire various types of companies and all kinds of industry" largely in the energy industry. Such activities led to, among other things, a substantial amount of experience in the coal mining industry and he became president of Coal Reclamation Company, a subsidiary of the Williams Companies. When Coal Reclamation Company was purchased by ICM Corporation, Mr. Henneke who, at the time of the trial, was 37 years of age, became an employee of that company. This company owned three coal mines in West Virginia, Virginia and Pennsylvania, and also brokered coal. During that time, he was in charge of the operational evaluation of Peabody Coal Company, a very large coal company operating throughout the United States. In such capacity, he visited 47 of the 53 coal mines owned by Peabody with a view to the acquisition of Peabody by his employer. In February of 1977, Mr. Henneke formed Arkoma Coal Corporation, with the purpose of engaging in the production and brokering of coal.

4. One of the entities which Mr. Henneke dealt with during his business experience was Titan Mining, one of the David R. Kane entities, and through that experience he became acquainted with Robert M. Traylor and Jim P. Elliott, associates of Mr. Kane and shareholders in one of Kane's companies, Titan Mining, Inc.

5. During his employment by ICM Corporation and subsequently through his own company, Arkoma, Henneke had been involved in exploring for and locating coal reserves of a high quality and economically minable. Through those contacts, it entered into a long-term contract with United States Steel to provide this company with a metallurgical grade coal known as "coking coal" for use by the steel company to produce steel at its Gary, Indiana, plant.

6. The Gary plant was being supplied by Henneke's company from a number of small mines in Oklahoma and Arkansas and, among others, Arkoma purchased coal from Kane's companies, which he knew as Titan Mining (the chart attached to this opinion shows that Kane had mining companies known as Titan Mining, Inc., Titan Mining, Ltd. 75-1, James Associates, Ltd., Titan Mining II, Inc., and Titan Mining II, Ltd.).

7. Some of the coal furnished by Kane's companies were provided from the Paris, Arkansas, area and Henneke was advised that Titan Mining was interested in opening a mine near Spadra, Arkansas, on the Philpott seam, a specific coal seam in Arkansas which was reputed to contain a high grade of metallurgical type coal.

8. During the summer and fall of 1977, Henneke negotiated with Kane and Kane Associates, Elliott and Traylor, with a view towards developing the Philpott seam and the purchase by Arkoma of the coal produced.

9. The coal being produced by Titan was of a higher sulphur content than desired and the Kane organization desired to open a mine on the Philpott seam to produce a high quality metallurgical coal so that it could be blended with Titan coal which had been produced at the other locations so that a better overall price could be obtained. The Kane organization desired a long-term contract with Henneke so that an entity could be formed to mine the Philpott seam coal.

10. During the period prior to December 30, 1977, various negotiations were carried on between the parties, with the Kane group referring to themselves, both orally and in writing, as "Philpott Associates." These negotiations culminated on December 30, 1977, with the agreement introduced as Plaintiff's Exhibit 2 being executed by the parties. Prior to two days before the date that the contract was executed, Henneke was advised by the Kane group that the contract would be between Arkoma and Philpott Associates, a limited partnership, with substantial net worth. Contracts were prepared showing Philpott Associates, a partnership, as one of the contracting parties. Plaintiff's Exhibit 24 is an example of one of these drafts of a proposed contract.

11. Two days before the contract was signed, Henneke was advised by the Kane group that the contracting party should be changed from Philpott Associates to Coking Coal, Inc., and on the day that the contract was signed, the final draft showing this corporation as the contracting Kane party was prepared and delivered by Henneke to the Train Station (one of Kane's endeavors and the location of his office) in Little Rock, Arkansas, where it was executed. Present at the execution or at least during some of the time prior to the execution of the document were Mr. Kane, Mr. Elliott, Mr. Traylor, and at least during part of the time, Mr. Clay Robinson, an attorney from Fort Smith and an investor in the venture and one of the defendants in this lawsuit.

12. During the discussions at the Train Station leading up to the execution of the contract, Henneke was "very concerned about who I was dealing with and whether they had the substance and the ability to perform under the contract that I was prepared to sign because I was taking on some very severe obligations and I wanted to make darn sure who I was dealing with." (Tr. 16) This concern was, among other things, caused by the fact that the contract which Henneke was entering into was the longest term contract ever entered into by Arkoma and provided for Arkoma to pay a premium for the coal and was the most expensive contractual obligation Henneke had ever entered into. The contract was for a five-year period and provided for Coking Coal to mine and sell to Arkoma a minimum of 7,000 tons of coal per month beginning April 1, 1978, through December, 1978, and 8,500 tons per month beginning January 1, 1979, and continuing through the term of the contract. Based on this contract, and because of the purchases made in it, Henneke had committed to furnish metallurgical grade coal to United States Steel with the hope and belief

that he would receive a premium price for it.

13. During the negotiations leading up to the execution of the contract, Henneke had been led to believe by the Kane group that he would be dealing with either a general partnership or a joint venture and when he discovered that, in fact, the contracting party would be Coking Coal, Inc., a three-hundred-dollar shell corporation, he became concerned and substantial discussions were held with the Kane group (Henneke contends and testified that Clay Robinson also participated, a claim which Robinson denies) about the financial stability of the contracting party.

14. To allay his fears, and to show him that he was, in fact, dealing with an entity with substance rather than a three-hundred-dollar shell corporation, the Kane organization showed to Henneke what was introduced as Plaintiff's Exhibit 1, which is an Investment Memorandum dated December 15, 1977, which had been prepared to provide to prospective investors, and which showed that the entity being formed would be a limited partnership known as Philpott Associates, with a minimum worth of $409,-266.00, and a maximum worth of $4,501,-929.00. The Investment Memorandum contains a number of other statements and disclosures which will be discussed in more detail in the "discussion" portion of this opinion.

15. Henneke was aware at the time that the discussions were taking place that an enormous amount of money would be necessary to open and operate a coal mine and knew that a corporation with a net worth of $300.00 would not be sufficient to do so. He was led to believe by the Kane organization, acting through David R. Kane and Jim P. Elliott, that Coking Coal, Inc., was to be simply the manager of the project and the contracting party so that, among other reasons, it would not be necessary for Arkoma to deal with each of the individual partners.

16. The Kane organization was made aware that, based upon the contract, Arkoma would represent to U.S. Steel that it could and would provide them with a long term supply of metallurgical grade coal, and was further made aware that Henneke desired to deal only with an entity with sufficient substance to ensure that Coking's part of the bargain was carried out. These concerns resulted in extensive discussions before the contract was signed with Jim Elliott, David Kane and, according to Henneke, Clay Robinson.

17. During these discussions Henneke was advised that the legal entity through which the venture was to be financed had again changed because of the advice of New York tax counsel that the tax benefits desired by the investors would not be available through a limited partnership. He was told that the form of entity would be changed to a joint venture and because of his concern that the venture be financed by persons or entities with substance, he inquired about the effect of the latest change. He was led to believe that substantially the same investors who would have been limited partners would become joint venturers to be known as Philpott Associates, with substantially the same net worth as had been intended for the limited partnership. He was further advised that the contract with Coking Coal was for the purpose of simplifying administration, and that the joint venturers were, in reality, the persons with whom he was dealing and upon whom he could rely for the substance which he desired and which was obviously required for a venture of this nature. Based upon those representations, Henneke's concerns were satisfied, and the contract was signed.

18. The documents and evidence introduced show, and in fact the defendants admit, that the Kane organization had first intended to finance the mining operation through the limited partnership exemplified by Plaintiff's Exhibit 1, but, for tax reasons, it became necessary to change the form of legal entity to one of a joint venture which is described in great detail in an Amended Investment Memorandum dated December 27, 1977, and introduced as Plaintiff's Exhibit 3.

19. All witnesses seem to agree that Plaintiff's Exhibit 3 (the Amended Investment Memorandum) although dated December 27, 1977, was not prepared until January and February of 1978, but was backdated by the Kane organization for tax reasons.

20. By letter dated February 15, 1978 (Plaintiff's Exhibit 3A), Jim Elliott mailed to Henneke a copy of the Amended Investment Memorandum and advised Henneke that, "Enclosed you will find a copy of the 'finally approved' Philpott Associates prospectus that was exempt last Friday by the Securities Commissioner here in Arkansas. We have reissued them to our investors." The letter further advised Henneke that, "We have received rejection of recissions [sic] and are paying Mr. Bibeau $250,000 today." The court believes and finds that there could have been no other purpose for the mailing of the Amended Investment Memorandum to Henneke other than to show Henneke that the form of entity which he claims had been disclosed and described to him had in fact come into being. This is reinforced by the fact that $250,000.00 had been paid to the contract miner, an amount which a three-hundred-dollar corporation could not even conceivably have paid.

21. The reference to the rejection of rescissions referred to in Elliott's February 15 letter has to do with the fact that a number of investors had subscribed to the entity believing that it was to be a limited partnership. Plaintiff's Exhibit 15 is an example of such subscription. Investors who had already subscribed were mailed a "rescission letter," an example of which is attached as Exhibit "B" to the joint stipulation of the parties received by the court as Joint Exhibit "A". It appears that all investors who had previously subscribed to the limited partnership rejected their right to rescind and subscribed to the new venture. Plaintiff's Exhibit 20 is an example of the new subscription agreement.

22. The court finds and believes from the evidence that prior to and immediately after the signing of the December 30, 1977, contract, the Kane organization set about, without the knowledge of Henneke, to provide insulation to the investors not normally available in a joint venture such as the one that had been formed. The evidence indicates that some investors had voiced concern about potential liability resulting from the joint venture. It appears that this continued to at least as late as September of 1980 because, at that time, Kane was advising the joint venturers that an attempt would be made to convert the joint venture to a limited partnership. *See* Plaintiff's Exhibit 23. The methods used by the Kane organization to attempt to insulate the investors from individual liability is described in the letters from Mr. Robinson to Mr. Kane dated January 13, 1978 (Plaintiff's Ex. 25), and February 22, 1978 (Plaintiff's Ex. 26). These attempts by the Kane organization to provide such insulation were not disclosed to Henneke or other officers or employees of Arkoma, and Robinson's letters of January 13 and February 22, 1978, were not provided to him.

23. The documents received in evidence at the trial of this matter and other evidence adduced at the trial causes the court to believe and find that the investors banded together for the common purpose of mining coal from the Philpott seam in Johnson County, Arkansas, for which they owned or intended to acquire the mineral rights; that they had a mutual right of control in respect to such operation; and that they had an express agreement to share the profits and losses obtained from such venture. Coking Coal, Inc., was also an investor and was designated, primarily for convenience purposes, as the manager of the operation. Page 21 of the Investment Memorandum provides that the manager is authorized to carry out ministerial duties, but will not be empowered to make any major decisions without the approval of a majority of the working interests owned by the investors. This is also provided in the Joint Operating Agreement. Defendants' Ex. 12. It is also clear from these documents and from other evidence in the trial that the investors had expressly agreed for the sharing of profits and losses from the operation.

24. When the contract between Arkoma and Coking dated December 30, 1977, was entered into, such agreement was made for and in behalf of the venture, Philpott Associates, and there is no evidence to indicate that the contracting parties had any other intent, or at least that any such contrary intent was, if present, disclosed to Arkoma. To the contrary, Mr. Henneke was informed by agents of the Kane organization that the contract was being entered into by Coking for convenience purposes only and it was acting for the legal entity which would provide the money for the operation. The court finds that Mr. Henneke, an educated and knowledgable businessman, took every measure within his power to make certain that he was dealing with an entity of substance, and that he would not have executed the agreement had he been advised that he could look only to a corporation with a $300 net worth to fulfill the substantial contract being entered into.

25. Soon after the operation was commenced, it incurred substantial difficulties. The court finds that it would serve no purpose to detail those in these findings of fact or in this opinion because there were obviously many. They included numerous quality problems and substantial operating problems which were apparently unforeseen at the time that the operation was begun. Many of these difficulties incurred are set forth in Mr. Kane's letter to Mr. Henneke dated October 13, 1978, and received as Plaintiff's Exhibit 14. For example, it was planned that the Philpott seam of coal be mined through a strip mining operation and, for some unexplained reason, the organization did not become aware until after operations had begun that the seam was a thin one and sloped downward at a 47-degree slope, causing the coal to, very quickly, become too deep for economical mining in the manner contemplated by the venture.

26. On October 30, 1978, Coking Coal, Inc., filed suit against Arkoma Coal Corporation in the Chancery Court of Johnson County, Arkansas, seeking certain declaratory and injunctive relief. Defendants' Ex. 3.

27. Arkoma Coal Corporation filed an answer and counterclaim seeking damages for breach of the December 30, 1977, contract, and prayed for damages in the amount of $225,000.00 and additional damages which were continuing to accrue. Defendants' Ex. 4.

28. For unexplained reasons, the case did not come to trial until June 28, 1982. At that time R.H. "Buddy" Hixson and Jim Elliott appeared in behalf of the plaintiff and apparently took the position that the case was not ready for trial and should be continued. In spite of this position, the case was tried and a judgment entered against Coking Coal, Inc., on defendants' counterclaim in the amounts set forth above. Although one or more of the defendants in this lawsuit apparently had knowledge of the Chancery Court lawsuit, none of them were officially notified nor made parties to the action, and none were served in the case.

29. One of the defendants in this lawsuit, Rustam A. Malik, died on November 5, 1979, and a petition for the probate of his will was filed in the Probate Court of Jefferson County, Arkansas, on November 28, 1979, and the notices required by the probate law of the state of Arkansas were given and the legal notice required run in a daily newspaper of general circulation in Jefferson County, Arkansas. Defendants' Ex. 14.

30. A claim against the estate setting forth the claims made in this lawsuit was filed by Arkoma Coal Corporation on November 7, 1983.

### DISCUSSION

■ This case is about the desire by many, overwhelming in some cases, to avoid or reduce their liability to pay federal income taxes by use of "tax shelters." The investors in this case entered into the arrangement because they were looking for a tax shelter, and it is obvious from the file and testimony in this case that they found one.

Be that as it may, the issue in this case is whether the defendants, individual inves-

tors in the venture described in the findings of fact above, are personally liable for the judgment against Coking Coal, Inc., which was entered in the Chancery Court of Johnson County, Arkansas. While the defendants make a number of contentions raising substantial legal issues in relation to several aspects of the case, the primary or at least ultimate issue which the court must face and decide is whether Arkoma Coal Corporation may look only to Coking Coal, Inc., a corporation with a three-hundred-dollar net worth, in respect to the obligations imposed in the December 30, 1977, contract entered into between Arkoma and Coking.

The defendants earnestly contend that the contract is simply between Arkoma and Coking, and that they, in effect, had and have nothing to do with it. They say that Coking, in its own behalf, agreed to do certain things, and if it breached the contract, only it is responsible, not the investors in the joint venture who unquestionably provided the money necessary to begin the operation. In fact, defendants have objected throughout the trial to the court's allowance of any testimony intended to show the intent of the parties at the time of the signing of the contract, and subsequent thereto, citing the parol evidence rule. During the course of the trial, the court, on the record, ruled that the parol evidence rule did not apply because the evidence adduced in respect to the actions of the parties at and after the signing of the contract were relevant on the question of what the "real" arrangement was between the investors in relation to the operation and the intent of the parties to the December 30, 1977, contract at the time that it was signed. The court believes that its ruling in this respect was correct, and that aspect of the case will not be discussed in this opinion. *See Blount v. McCurdy*, 267 Ark. 989, 593 S.W.2d 468 (1980).

In essence, defendants contend that they had little more contact with this arrangement than the banding together by them because they owned the right to mine the coal in the Philpott seam. They contend that the effect of their arrangement simply was that they owned the coal and entered into a Joint Operating Agreement with Coking Coal, Inc., to mine the coal. The Joint Operating Agreement was received as Defendants' Exhibit 12. Their position is that after having agreed to mine the coal through the Joint Operating Agreement, they, at the same time, entered into a Coal Sales Agreement (Defendants' Ex. 7) in which the joint venture agreed to sell all of the coal mined to Coking Coal. Coking Coal then entered into the December 30, 1977, contract with Arkoma, and defendants contend that that was nothing more than a legitimate sales contract between Coking and Arkoma to market the coal which Coking had purchased from the joint venture.

It is true that this is the arrangement on the surface, and seems to have been rather carefully crafted. However, the court is convinced that the real arrangement between the parties is that they entered into a joint venture to finance, mine and sell coal and that they were "all in this together" from the beginning to the end.

The court is convinced that the arrangement between the investors was one of a joint venture which they formed for the sole purpose of acquiring, mining and marketing the coal in the Philpott seam. Certainly, in the court's view, all of the evidence points to this and shows that this was a classical joint venture in every sense of the word.

A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each joint venturer shall stand in the relation of principal, as well as agent, as to each of the other coventures, with an equal right of control of the means employed to carry out the common purpose

of the venture. 46 Am.Jur.2d *Joint Ventures* § 1.

As Judge Lemley, writing for the United States District Court for the Eastern District of Arkansas, said:

> In order to constitute a joint venture, it is essential that there be a joint proprietary interest in the subject matter of the venture, a right of mutual control with respect thereto, and an agreement, express or implied, for the sharing of profits. *United States v. Westmoreland Manganese Corp.*, 134 F.Supp. 898 (E.D. Ark.1955). *Citing* 30 Am.Jur. *Joint Adventures* §§ 11 and 12.

The court is convinced that in this case all of the elements of a joint venture were present. There is little question, as the court has already pointed out, that the defendants banded together for the sole and only purpose of acquiring the rights to mine the coal in the Philpott seam. The very name of the organization which was formed bears this out. Thus, there can be little question but that there was "a joint proprietary interest in the subject matter of the venture."

There is also little question but that the second portion of the test to determine whether a joint venture exists is present in this case. The defendants do not even argue that they did not have "a right of mutual control." This is amply evidenced by both the Investment Memorandum describing the joint venture to be formed and the Joint Operating Agreement entered into. Paragraph 3 of the Joint Operating Agreement provides specifically that the investors shall have final control over any major decisions. There is little question but that they not only can direct the actions that Coking Coal, Inc., takes, but might, upon proper notice described in the agreement, terminate completely their relationship with Coking Coal. In short, the investors could control, and direct the activities of Coking or, if they desired, terminate, upon 30 days notice, any relationship with Coking and could then, of course, operate the mining venture themselves.

It is equally clear that the investors had "an agreement, express or implied, for the sharing of profits." Again, this is amply evidenced by the Investment Memorandum. The contents of this memorandum make it clear that not only did the investors contemplate that they would share any profits, but also any losses incurred. Several passages in this document show without question that the investors went into that aspect of the matter with "their eyes wide open." The document is replete with disclosures and warnings in this respect. At page (i) in bold type it is stated:

> **IT IS AN EXPRESS CONDITION OF ADMISSION TO THE VENTURE THAT AN INVESTOR DELIVER A REPRESENTATION OF (i) NET WORTH OF AT LEAST $100,000 AND (ii) PROSPECTS OF 1977 INCOME SOME PORTION OF WHICH WOULD BE SUBJECT TO COMBINED FEDERAL AND LOCAL INCOME TAXATION AT A RATE OF NOT LESS THAN 50%.**
>
> \* \* \* \* \* \*
>
> **THE INVESTMENT DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK (SEE "RISK FACTORS") AND THE PURCHASE OF WORKING INTEREST SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE TOTAL LOSS OF THEIR INVESTMENT, AND WHO UNDERSTAND THE LACK OF LIMITED LIABILITY IN CONNECTION WITH THE ACTIVITIES OF THE PROGRAM.**

Then, page 1 of the memorandum describes in considerable detail the risk that any investor will undertake who becomes a member of the investor group.

The Investment Memorandum also makes it obvious that the investors were told, more than once, that if they entered into the contemplated arrangement they should be aware that they would be "... PERSONALLY LIABLE (on a joint and several basis) for all the Venture liabilities." *See* p. 4 of the memorandum. The investors were told:

> Additionally, each Participant as the owner of a Working Interest in the Venture will be personally liable for his pro-

portionate share of losses of the Venture in excess of his original investment, including liabilities and damages arising out of operating hazards which are not insured or which exceed insurance limits, due to the unlimited liability attendant to fractional undivided interests.

P. 7 of Investment Memorandum.

At p. 15 the investors were warned, in bold type, that: "... **INVESTORS MAY BE CALLED UPON FOR ADDITIONAL CAPITAL CONTRIBUTIONS TO MEET THE NEEDS OF THE VENTURE. INVESTORS SHOULD ALSO NOTE THAT THEY HAVE UNLIMITED LIABILITY TO THIRD PARTIES.**"

It would serve no useful purpose to delineate other examples in the Investment Memorandum of the disclosure and warning to potential investors that they were not only engaging in a risky business, but one that might very well entail personal liability to them. Suffice it to say that no one with even reasonable intelligence could have even scanned the Investment Memorandum without becoming fully aware that a speculative and risky business was about to be engaged in which very likely could cause unlimited personal liability to persons who invested in the venture. Not only is that true, but it is equally obvious from these passages that, irrespective of the legal instruments which were utilized to attempt to insulate the investors, the real intent of the parties, or at least the effect of their participation, was to form a group of investors constructed in such a way "that there be a joint proprietary interest in the subject matter of the venture, a right of mutual control with respect thereto, and an agreement, express or implied, for the sharing of profits." *United States v. Westmoreland Manganese Corp.,* *supra.*

In short, the court does not believe that the formation of a three-hundred-dollar corporation known as Coking Coal, Inc., had any purpose other than to allow for an ease of operation which would not be present if the participants had to deal with multiple investors. In the court's view, there is little question but that this was a joint venture between the investors to carry out the purposes discussed above and that Coking Coal's part in the joint venture was nothing more than to act as a manager for it and to broker its coal. This is evidenced by the fact that many of the documents speak only of Coking Coal as the "manager." It is also significant that none of the documents relied upon for the defendants to provide insulation were signed by any of the investors. For example, the Joint Operating Agreement (Defendants' Ex. 12), is signed in behalf of Coking Coal, Inc., by its vice president, and this same individual also signed for Philpott Associates.

The venture organization chart (Ex. B to this opinion) prepared by the Kane organization belies the investors' contention that the joint venture merely sold the coal mined to Coking and then "washed their hands of the whole deal." They argue that they sold the coal to Coking in a simple sales transaction and that Coking then, acting in its own behalf, sold "its" coal to Arkoma by means of the December 30, 1977, contract. Contrary to this contention, the organization chart designates Coking Coal, Inc., as "Coal Broker" with a line running between the block used to represent Coking and the one representing Philpott Associates with a notation that there is a "Coal Brokerage Contract" between them. This makes it abundantly clear that the Kane organization which put the venture together did not really believe that all of the legalistic maneuvering engaged in resulted in anything other than a joint venture to mine the coal, with Coking Coal, Inc., acting as the manager of the venture and the broker to sell the coal owned and produced by the joint venture.

The substance of the arrangement between the parties was, by no stretch of the imagination, simply one in which the joint venture contracted with Coking Coal to sell it coal with no concern or regard whatsoever about what Coking Coal did with it. This was not an arrangement where the joint venture sold coal to Coking Coal and Coking Coal then in turn sold it to Arkoma. Coking Coal was formed for the specific purpose of being used as a vehicle for the

joint venture to deal through. The effect of all of this is that investors known as Philpott Associates banded together and invested money to acquire coal reserves, mine the coal, and sell it, with the expressed intent to share any profits or losses, and with the specific intent of providing tax shelters to the individual investors. The investors simply cannot "have their cake and eat it too."

> Whether persons have entered into a joint venture depends largely upon the terms of the particular agreement, upon the construction which the parties have given it, as indicated by the manner in which they have acted under it, and upon the nature of the undertaking . . . .

46 Am.Jur.2d *Joint Ventures* § 7.

Using the traditional tests, the court is convinced and finds that the arrangement between the investors in this case was a joint venture.

 Even it is assumed, *arguendo,* that the investors did not intend to enter into a joint venture, or even if they took great care not to do so, the court is convinced that they, through the Kane organization, led Ben Henneke, the principal of Arkoma, to believe that they had. The law clearly is that even though the creation of a relationship of joint venture is normally a matter of intent, "As to third persons, it is clearly the rule that the legal and not the actual intent of the parties controls, and the parties may be estopped in favor of third persons from denying that they are joint venturers, even though they never intended to become such." 46 Am.Jur.2d *Joint Ventures* § 9, and cases cited in that article at footnotes 18 and 19 of p. 31.

As the court has found in the findings of fact set forth above, there is little question but that Henneke was very concerned that he was dealing with a reputable entity with substance. Based upon Mr. Henneke's education and experience, and his demeanor and testimony at the trial, the court does not believe for one moment that he would have willingly entered into the December 30, 1977, contract with Coking Coal, Inc., knowing that it had a net worth at that time of $300, and fully knowing that it

could, by no stretch of the imagination, meet the obligations imposed upon it by the contract. Everyone present at the December 30 meeting knew that it took a great deal of money to even begin a coal mining operation and the court is convinced that Mr. Henneke was intentionally led to believe by members of the Kane organization, acting in behalf of the investors, that the investors would be individually liable on a joint and several basis. Mr. Henneke would not have signed the contract had he not so believed. In order to convince him that this was the case, Henneke was given by the Kane organization the initial Investment Memorandum (Plaintiff's Ex. 1) which could have had no other purpose than to attempt to convince him that he would be dealing with an organization of substance. The cover sheet would be read, certainly by someone with the experience of Mr. Henneke, to indicate that the organization would have a minimum worth of $409,-266.00, and a maximum worth of $4,501,-929.00. If Mr. Henneke had merely scanned the memorandum (and the court believes that he did more than that) he would have been told, more than once, that the investors would be individually liable. Then, in order to fully convince him, if he was not already, that this was the case, Jim Elliott, of the Kane organization, mailed to him the Amended Investment Memorandum (Plaintiff's Exhibit 3) which the court has discussed in detail above, and again a mere scanning of this document by Mr. Henneke would have satisfied his expressed and admitted concern that he deal with an organization of substance. (Elliott testified at Tr. 243 that Henneke had this concern.)

Thus, it appears clear that if the investors did not intend to enter into a joint venture, they, through the Kane organization, intentionally led Henneke to believe that they had and that they would have unlimited liability, and then set about to attempt to remove the fears of some of the investors that they stood to lose more than they had invested, by crafting a series of agreements and arrangements which are described in Mr. Robinson's letters of Janu-

ary 13 and February 22, 1978 (Plaintiff's Ex. 25 and 26, respectively). The defendants admit that these letters were circulated only within the Kane organization, and apparently to at least some of the investors, but were not made available to Henneke so that he would know that the arrangement was not the one which had been described to him and which had been specifically set forth in the two Investment Memorandums that had been made available to him by the venture. Thus, irrespective of the intent of the investors, the legal effect of their actions controls, and they are estopped from now denying that they are joint venturers, at least insofar as Mr. Henneke and Arkoma Coal Corporation are concerned. *See also United States v. Westmoreland Manganese Corp.*, *supra*, at 925, for the proposition that investors may, by their actions, create a joint venture by estoppel.

In summary, the court believes and finds that the actions of the investors in this case indicate that they intended at the time that they entered into the business venture to create a joint venture, but that, even if that is not the case, that is the legal effect of their actions and they are estopped in favor of Henneke and Arkoma from denying that they are joint venturers.

Since that is the case, the court must now examine the effect on this case of that conclusion. Plaintiff contends that since the investors were joint venturers, they are jointly and severally liable for all of the liabilities incurred in behalf of the joint venture, including the liability represented by the judgment of the Chancery Court of Johnson County. As distinguished Judge John E. Miller said in *Archer-Daniels-Midland Co. v. Paull*, 188 F.Supp. 277 (W.D. Ark.1960):

> In actions against third parties the rights, duties and liabilities of joint adventurers are governed in general by rules that are similar or analogous to those which govern the corresponding rights, duties and liabilities of partners, except as they are limited by the fact that the scope of the joint venture is narrower than that of the ordinary partnership.

In *Myers v. Lillard*, 215 Ark. 355, 220 S.W.2d 608 (1949), the Arkansas Supreme Court said:

> The verdict found the appellants to be joint adventurers; and joint adventurers may be jointly and severally liable to third parties for the debts of the adventure.

This is, unquestionably, the law in most jurisdictions.

Thus, the court having found that the investors in this case were joint venturers, there appears to be little question but that they are jointly and severally liable to third parties for the debts of the venture. However, having answered that question, this does not necessarily mean that the plaintiff is entitled to recover on the facts of this case, at least as they now exist.

As is set forth in the findings of fact of the court, there appears to be no question but that the Johnson County Chancery Court suit was instituted by Coking Coal, Inc., purportedly in its own behalf, and that the counterclaim filed by Arkoma appears, on its face, to be only against Coking. Arkoma does not contend that it sued any of the individual investors in that lawsuit, nor even that it intended to do so. It is admitted that, while some of the investors may have had actual notice of the pendency of the suit, there was no formal notice given to the investors, and none of them were served with a summons and a copy of the complaint in that action. It appears from the evidence in this case that the defense, if it could be called that, by Coking of the counterclaim at the trial of the Chancery Court case was perfunctory to say the least. The transcript indicates that no one was present at the trial representing Coking other than its attorney and Jim Elliott, and it is not even contended that the individual investors were given an opportunity to contest the judgment that was ultimately rendered against Coking in that lawsuit. Plaintiff apparently contends that, in spite of this, the judgment rendered on the counterclaim against Coking is binding upon the investors irrespective of the fact that they were not parties and were

not given the opportunity to contest in any way the judgment or the amount of it.

█ It is perhaps appropriate for the court to first point out that the doctrine of collateral estoppel does not preclude the defendants in this case from raising this issue even in view of the holding of the Court of Appeals for the Eighth Circuit in *Davidson v. Lonoke Production Credit Ass'n,* 695 F.2d 1115 (8th Cir.1982). That doctrine does not apply so as to bind one who had no opportunity to participate in the suit that resulted in the judgment, at least absent a showing that the party which is to be precluded controlled or participated in controlling the defense of the action. In fact, it appears that the due process clause of the Fifth and Fourteenth Amendments would prohibit such effect. *Blonder-Tongue v. University Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788. As the Court said in that case at p. 329, 91 S.Ct. at p. 1443:

> Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They never have had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stands squarely against their position.

*See also* Case Note in Vol. 37, No. 2, Ark.L. Rev. 486 (1983).

In *New Coronado Coal Co. v. Jasper,* 144 Ark. 58, 222 S.W. 22 (1920), the Arkansas Supreme Court, when faced with the identical issue, held:

> The suit was against the New Coronado Coal Co., a partnership composed of A.M. Malone and C.M. McKoin. Judgment was rendered against it as an association of persons. There being no personal service on C.M. McKoin, the other partner, the effect of the suit and judgment was to bind A.M. Malone personally and as a partner, as well as the partnership fund impounded by attachment and garnishment.

The RESTATEMENT (SECOND) OF JUDGMENTS § 60 provides that a judg-ment in an action by an injured person against a partner upon an obligation or liability incurred in the course of the partnership business, if in favor of the injured party, does not terminate a claim that he may have against another partner based upon that obligation, but that it only

> renders the property of the partnership subject to execution to satisfy the judgment but is not otherwise binding on a partner who was not a party to the action unless he controlled or participated in controlling the defense of the action, or was given notice of an opportunity to defend the action.

As Judge Arnold pointed out in writing for the court in *Davidson, supra,* at 1121, the Arkansas Supreme Court's frequent citations of the RESTATEMENT OF JUDGMENTS as a source of authority tends to indicate that the Arkansas courts would not ignore the legal doctrines expressed in the new RESTATEMENT. In any event, the position taken by the new RESTATEMENT appears to be consonant with the Arkansas Supreme Court's 1920 holding in *New Coronado Coal Co., supra.* For the reasons set forth in Judge Arnold's opinion in *Davidson, supra,* the law appears to clearly be that in a diversity case a federal court is required to give the same preclusive effect to a state judgment as would the courts of the state in which the earlier judgment was rendered. 695 F.2d at 1117.

Applying what the court perceives to be the law in this respect, it then appears that the court has no choice but to hold that, based upon the evidence that was introduced at the trial, and on the state of the entire file as it exists at this time, the plaintiff cannot recover judgment against the defendants in the amount of the Johnson Chancery judgment or in any other amount.

In its complaint and amended complaint, the plaintiff alleged that it was entitled to recover from the defendants, jointly and severally, on the basis of the Chancery Court judgment and did not claim that they were entitled to recover on any other basis. The plaintiff relied only on the state court judgment and did not attempt to adduce

facts from which this court could assess damages against the defendants because of the breach (if there was one) of the December 30, 1977, agreement. Likewise, the defendants neither had an opportunity to defend themselves in the Chancery Court case nor in this case in respect to whether a judgment should be rendered for breach of the contract, or, if so, the amount of such judgment. This is true because, as is evident from the complaint, the plaintiff did not seek to try those issues in this case. The only thing that this court tried was whether the actions and activities of the individual investors caused them to be personally liable. That issue was fully tried and, for the reasons set forth above, the court rules that the defendants were engaged in a joint venture. Because of what the court believes to be the law in that respect, this means that the defendants are personally jointly and severally liable for any debts of the venture. But, for the reasons already expressed by the court, the court is convinced that it cannot render a judgment against them solely on the basis of the state court judgment. The case law discussed above and, in fact, the United States Constitution, requires that they be given an opportunity to litigate the question of whether plaintiff is entitled to a judgment against them because of breach of the December 30, 1977, contract, and the amount of such judgment. Since they have not had an opportunity to do so, the court has no choice but to decline to render judgment against them in this case.

In view of the court's holding in this respect, it is not necessary for it to decide, at least at this time, certain other issues raised by the parties, such as whether the Arkansas Non-Claim Statute (ARK.STAT. ANN. § 62–2601) bars recovery against the estate of one of the defendants, Rustam A. Malik.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and subject matter.

2. Since defendants were engaged in a joint venture at the time of the occurrence which is the subject matter of this lawsuit, they are jointly and severally liable for any indebtednesses and damages incurred by the venture in the course of its business, specifically including any damages arising as a result of breaches, if any, of a contract dated December 30, 1977 (Plaintiff's Ex. 2), between Arkoma Coal Corp. and Coking Coal, Inc. (the manager of the joint venture).

3. That, for the reasons set forth in the discussion herein, the court cannot render judgment against the defendants on plaintiff's claim herein.

1538

## EXHIBIT B

### VENTURE ORGANIZATION CHART

(1) McAllister Lease
(2) Other Leases
(3) Mining Contract at $29.00 plus cost of crushing coal (estimated at 50c)
(4) Mining Subcontract at $27.00 plus cost of crushing coal for first 125,000 tons $29.00 thereafter. Requires non-refundable contract of $250,000
(5) Participants in Philpott may broker coal thru Coking Coal, Inc. at a cost of 65c per ton
(6) Contract to supply coal at $41.00 per ton